USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1456

 BOSTON MUTUAL INSURANCE COMPANY,

 Plaintiff, Appellee,

 v.

 NEW YORK ISLANDERS HOCKEY CLUB, L.P.,

 Defendant, Appellant,

 v.

 BLUMENCRANZ, KLEPPER, WILKINS & DUBOFSKY, LTD.,
 d/b/a BWD GROUP, LTD.,

 Third-Party Defendant, Appellee.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Douglas P. Woodlock, U.S. District Judge]

 Before

 Boudin, Lynch and Lipez,
 
 Circuit Judges.
 
 

 Ted Poretz with whom Steven D. Guggenheim, Alyson M. Weiss,
Wende S. Ascher, Richards & O'Neil, LLP, Charles M. Campo, Jr., and
Kassler & Feuer, P.C. were on brief for New York Islanders Hockey
Club, L.P.
 Alan G. Miller with whom Thomas M. Elcock and Morrison,
Mahoney & Miller were on brief for Boston Mutual Insurance Company.
 Barbara A. Sheehan with whom Michael T. Walsh, Maura Bleichert
Lee and Walsh & Sheehan, LLP were on brief for Blumencranz,
Klepper, Wilkins & Dubofsky, Ltd. 

January 19, 1999

 
 

 BOUDIN, Circuit Judge. On or about November 14, 1994,
the New York Islanders Hockey Club (the "Islanders") submitted an
application to Boston Mutual Insurance Company ("Boston Mutual")
and various Lloyd's of London underwriters to insure its star
player, Brett Lindros, for temporary total disability as part of
the National Hockey League's group insurance plan. The Islanders
failed to disclose in the application that, before becoming a
member of the team, Lindros had sustained three concussions within
a span of a little more than a year, that he had received medical
treatment for each of these head injuries, and that he had
experienced headaches and dizziness from these episodes. 
 The facts as to Lindros's history of head injuries are
uncontested. In September 1992, Lindros suffered head trauma while
trying out for the Canadian National team. He experienced
temporary impaired vision and a nagging headache for most of the
day. Dr. Paul Thorne, a physician for that team, examined Lindros,
finding that the left side of his visual field was "abnormal." Dr.
Thorne read a CT scan of Lindros's brain to show signs of brain
edema, although he later revised his interpretation of the CT scan
to normal after obtaining the radiologist's expert judgment. Dr.
Thorne discussed with Lindros's father the risks of reinjury and
told Lindros to refrain from full-contact hockey for a week.
 Sometime in November 1992, Lindros sustained a second
head injury while playing for the Kingston Frontenacs. In the heat
of a game, after his helmet had fallen off, he was body-checked by
an opposing player and his head banged against the boards. After
the game, Lindros complained of impaired vision. On the suggestion
of his mother, who is a nurse, Lindros visited Kingston Hospital. 
After being examined by medical staff in the emergency room, he was
instructed to avoid physical contact for seven days. This incident
is documented by Dr. Thorne accordingly: "Nov[ember] 92--dizzy, hit
l[eft] temple, l[eft] homonymous hemianopsia 30-60 minutes."
 Lindros suffered a third blow to the head while playing
for Team Canada in Norway in November 1993, when he was again
"taken into the boards." Feeling "disoriented" and "fuzzy," he
left the game but later returned to play. Afterward, he was
diagnosed by a hospital therapist with "concussive head injury from
contact [with] boards/dasher." MRI and EEG tests two weeks later
revealed no abnormalities, and Dr. Thorne authorized Lindros to
play in an upcoming tournament but warned Lindros that "the risks
still, despite [his recovery], of further concussion is slightly
higher," and that in his view "the more concussions he has, there
is a risk of permanent brain damage when that happens."
 The Boston Mutual application, which the Islanders
completed in 1994 to secure coverage for Lindros, posed a series of
medical questions in two different parts; it specified that part I
was to be completed "by" the player and a designated club official
and part II "by" the player and club physician. The part I
questions asked inter alia what the club knew about past injuries
to the player (directing that the club, its physician and trainer
"must be consulted") and was to be signed by someone on behalf of
the club; part II asked detailed medical questions and was to be
personally signed by the player and club physician. In fact, the
team trainer, Edward Tyburski, answered all of the questions on the
application without first consulting the club physician, Dr. Gerald
Cordani, or Lindros himself. Lindros and Dr. Cordani simply signed
the relevant forms in the appropriate places, as requested by the
Islanders, apparently without verifying the accuracy of the
answers, as the trainer had requested them to do.
 The completed application did not disclose any of
Lindros's three prior concussions even though a number of
questions--if answered accurately--called for such disclosures. In
particular, question (5)(b) of part I asked whether the club knew
if Lindros had experienced any pain or discomfort for which he
sought medical advice or treatment within the previous year; the
form asked for details if the applicant answered in the
affirmative. The Islanders's answer noted only Lindros's January
1994 knee sprain. The club's own physical examination of Lindros
in September 1994 had apprised it of at least one of his prior
concussions.
 Similarly, none of Lindros's concussion-related
examinations were revealed by Lindros or the club doctor in
response to question 4(a) of part II, which asked if Lindros had
undergone a nonroutine examination by a physician within the past
three years (only the knee injuries were disclosed in response). 
Although question 5(g) of part II inquired as to whether Lindros
had ever had any known indication of or been treated for dizziness
or headache, the application answered "no." There were other
seemingly inaccurate answers but the district court declined to
rely upon them, saying that they had not been timely identified as
errors.
 Lindros retired at the end of 1995 after suffering three
more serious concussions in short succession while playing as an
Islander. Shortly thereafter, the Islanders filed a claim under
the insurance policy, seeking to recover approximately $4.3
million--the bulk of Lindros's salary for the period remaining in
his 5-year contract term. According to the policy, once a
deductible is met and an insured player misses 30 consecutive
regular season games due to a disability, the policy reimburses the
team for 80 percent of the player's salary during his disability. 
The claim was denied by the insurers on the ground that the
Islanders failed to reveal relevant information on their insurance
application by omitting Lindros's history of prior head injuries. 
 Boston Mutual then commenced this action to rescind the
policy. The Islanders counterclaimed for payment under the policy
and impleaded third-party defendant Blumencranz, Klepper, Wilkins
& Dubofsky, Ltd. ("BWD"), the National Hockey League's insurance
broker that administers the insurance program. The Islanders
alleged, inter alia, that BWD as agent breached its duty of care,
assertedly owed to the Islanders, by failing to forward to Boston
Mutual Lindros's 1994 team physical which indicated that he had had
at least one concussion.
 After discovery, Boston Mutual and BWD moved for summary
judgment. The district court granted the motions. It rejected
recovery under the policy, holding that the Islanders intended to
deceive the underwriters and, alternatively, that the Islanders's
misstatements had the effect of increasing the insurers' risk of
loss. On the Islanders's claim against BWD, the court said that
BWD's failure to verify the accuracy of the application or submit
documentary materials on the Islanders's behalf did not breach any
putative duty of care. The Islanders now appeal.
 We review the district court's entry of summary judgment
de novo, viewing the evidence in the light most favorable to the
Islanders. See Iglesias v. Mutual Life Ins. Co. of New York, 156
F.3d 237, 239 (1st Cir. 1998). The policy at issue is governed by
Massachusetts law, which permits an insurance company to avoid a
policy based on the misrepresentation of the insured, if "such
misrepresentation or warranty is made with actual intent to
deceive, or . . . the matter misrepresented . . . increased the
risk of loss." Mass. Gen. Laws ch. 175, 186. If either prong of
the test is satisfied, an insurer may rescind a policy.
 The application did contain misrepresentations: as
already described, it failed to reveal the three head injuries that
occurred in 1992 and 1993 even though disclosure was clearly called
for by several of the questions. Whether the false answers were
given with actual "intent to deceive" or the false answers
"increased the risk of loss" are more difficult questions. We
begin with the district court's determination that actual intent to
deceive was established as a matter of law.
 In resolving the issue, our first problem is to decide
what is meant by the phrase "actual intent to deceive" as used in
the Massachusetts statute. Massachusetts law sometimes appears
confusing on this issue, but a careful reading of the cases reveals
a pattern to which most of the language and outcomes can be fit. 
Of course, the Massachusetts Supreme Judicial Court has the last
word on this issue; but in the meantime, we think a brief
discussion may be helpful to district courts faced with this issue.
 In general, a false answer does not itself automatically
prove deceitful intent--the mistake could easily be a reasonable
one or merely negligent. At the other end of the spectrum, a
false statement in an insurance policy, known by the applicant to
be untrue and deliberately intended to induce reliance on the false
statement, indicates actual deceit. See Danca v. Taunton Savings
Bank, 429 N.E.2d 1129 (Mass. 1982). The real difficulty lies
between these end points, especially with false statements that
might be described as reckless.
 We agree with the district judge that actual deceit may
exist in certain cases where an applicant makes a false statement
without actual knowledge of its falsity. Imagine a case where--
although not certain that his answers are false--an applicant knows
full well that he is ignorant as to their truth or falsity and
intends to deceive by conveying a false impression that he believes
the answers to be true. Cf. United States v. London, 66 F.3d 1227,
1241 (1st Cir.), cert. denied, 517 U.S. 1155 (1996) (standard
"willful blindness" instruction).
 Yet in other cases, an applicant's false statement might
be reckless, even suggestive of fraud, but fall short of compelling
an inference of deliberate deception or bad faith. Put more
simply, the recklessness rubric may cover some cases in which the
applicant is actually deceitful but also others in which he is
simply careless in the extreme. In the latter instance,
Massachusetts does not impute actual deceit as a matter of law. 
Cf. Sullivan v. John Hancock Mutual Life Ins. Co., 174 N.E.2d 771,
774 (Mass. 1961); McDonough v. Metropolitan Life Ins. Co., 117 N.E.
836 (Mass. 1917).
 Turning to the present facts, we agree with the district
judge that the Islanders's conduct was indisputably reckless in the
sense that it was careless in the extreme. But whether a jury
would be compelled to conclude that "the Islanders" consciously
conveyed a false impression is a more difficult issue, especially
because we are dealing with the state of mind of three different
individuals who knew only different parts of the puzzle: the
trainer who completed the application but whose state of knowledge
as to the past concussions is unclear, and Lindros and the club
doctor who knew more but may never have read the application.
 The gap as to subjective intent might be filled by a more
detailed assessment, but this course is unnecessary given the
district court's alternative ground for summary judgment, namely,
its conclusion that the false statements were material as a matter
of law under section 186. "Materiality" may mean different things
in different contexts. But the Massachusetts statute provides a
definition to focus the inquiry: a false answer is material under
section 186 if "the matter misrepresented . . . increased the risk
of loss" for the insurer. Mass. Gen. Laws ch. 175, 186.
 An understanding of why this requirement exists informs
its interpretation. On this branch of the Massachusetts statute,
an innocent or merely carelessly false statement may avoid the
policy. Absent actual deceit, the materiality requirement limits
avoidance to cases where an accurate answer could reasonably have
affected an insurer's choices--for example, whether to insure the
applicant, whether to impose exclusions, whether to charge a higher
premium--decisions largely governed by perceptions as to the
likelihood and magnitude of loss.
 At the same time, the statute does not go so far as to
require proof by the insurer that it would have acted differently
(although such proof certainly tends to establish materiality,e.g., Barnstable County Ins. Co. v. Gale, 680 N.E.2d 42 (Mass.
1997)). Where the misstatement would "naturally influence" the
judgment of the underwriter, id. at 44, it may be material without
proof that the insurer would ultimately have refused to insure the
applicant or would have charged more for the insurance. This
objective definition is broadly consistent with the way
"materiality" is defined in other contexts. See, e.g., United
States v. Corsino, 812 F.2d 26, 30 (1st Cir. 1987) (finding
statement material for purposes of federal anti-fraud statute if it
has a "natural tendency to influence . . . a governmental
function").
 Whether a misstatement increases the insurer's risk of
loss "is ordinarily a question of fact." Keefe v. John Hancock
Property & Cas. Ins. Cos., No. 9429, 1997 WL 733843, at *4 (Mass.
App. Div. Nov. 17, 1997). Nevertheless, the issue is often
resolved as a matter of law under Massachusetts law where the
health condition or occurrence falsely concealed is objectively
serious enough that no reasonable person could doubt that it
increased the risk of loss. If the cases are sometimes hard to
reconcile, this is partly because they cover almost a century of
changing medical knowledge and partly because of variations in the
background facts (e.g., what was asked, what was disclosed, and in
what circumstances).
 Here, the primary witness for the insurers as to risk was
Dr. John Brennan, a consulting physician to the National Hockey
League's underwriters. Dr. Brennan opined by affidavit that had he
known of Lindros's prior injuries, he would have advised the
insurers at a minimum to exclude insurance coverage for head
injuries and brain damage. His deposition indicated that repeated
head injuries can produce cumulative brain damage. And this
testimony is consistent with the opinion expressed by Dr. Thorne,
one of Lindros's physicians, regarding the risk of permanent damage
from repeated injury.
 Yet Dr. Brennan was a less-than-ideal witness for the
insurers in several respects: he does not specialize in neurology
and his experience with repeated head trauma apparently involved
boxers exclusively (for whom cumulative effects are well documented
but whose repetitive head trauma could be distinguished from the
kind of less frequently repeated injury suffered by hockey
players). And although Dr. Brennan testified to his understanding
that the effect of brain injuries can be cumulative, he did not
claim a close acquaintance with the scientific literature on the
subject. 
 The Islanders's own expert, Dr. Robert Cantu, had strong
qualifications and directly disputed the proposition that
cumulative brain damage necessarily results from repeated injury of
the kind suffered by hockey or football players (rather than
boxers). Although impeached to some extent by his own previous
writings, Dr. Cantu said that it depends on the individual whether
such cumulative effects will be manifested. And in Brett Lindros's
case specifically, he found no evidence of cumulative damage from
examining his medical records.
 However, what Dr. Cantu did not dispute is the
statistical conclusion, exemplified by a study of "several thousand
high school football players" finding that players who had
sustained one concussion were four times more likely to suffer
another than those players who had never had one. Whether such
data is a function of some athletes' more aggressive tactics (as
Dr. Cantu himself believes), their greater susceptibility based on
past injuries, or merely an individual predisposition to head
injury matters not. It is enough that the defendant's own expert
effectively conceded that prior concussions have been shown
significantly to increase the risk for the class.
 The question remains whether the increased risk should be
disregarded if, as the Islanders claim to be true, the insurers
would in fact have issued the same policy for Lindros, without any
exclusion, and without any change in premium, even if they had
known all of the information about the prior concussions. The
insurers offered affidavit evidence that the information would or
could well have altered the outcome; but the affiant himself had
admitted in deposition that coverage had been granted without
further investigation to 20 or more previously concussed players;
and a separate study offered by the Islanders found no case, among
a large sample, where a denial or exclusion under this policy had
been based on such a disclosure.
 There are various reasons why a player might be covered
without any change in the policy despite increased risk: policies
"group" risks, actuaries draw classification lines at different
points, and insurers who have a major continuing policy covering an
important sports industry have plenty of reasons to be
accommodating to the insured teams. In this case, the evidence of
past practice does not raise a disputable issue as to whether the
objective risk was increased. It certainly does raise the question
whether the new information would have altered the insurers'
response to the application.
 The Massachusetts statute on its face makes proof of
objective risk sufficient, and the cases look in this direction
although none is conclusive. See note 4, above. Further, given a
false application, there are reasons to avoid a retrospective
inquiry that can rarely be answered with perfect confidence: here,
for example, it is not clear that the underwriters had ever insured
a player with as many as three prior concussions and the several
troubling symptoms that accompanied them in Lindros's case. Under
Massachusetts law, it is enough that the application was false in
substantial respects and that the information omitted did
materially increase the risk to the insurer.
 A final issue remains. The Islanders argued that the
trial court erred by entering judgment in favor of BWD because the
evidence permitted a jury to find that BWD breached its alleged
duty of care to the Islanders when it failed to forward Lindros's
1993 team physical to the underwriters. The physical would have
shown at least one prior concussion and--if forwarded--would have
provided the insurers with some additional warning.
 The district court properly found that, even assuming BWD
was the Islanders's agent, no rational jury could conclude that BWD
failed to fulfill its obligation to the Islanders. It is
undisputed that BWD (as the National Hockey League's broker)
informed the Islanders's own insurance broker, Sterling & Sterling,
that team physicals were no longer required after January 1993, and
that BWD also relayed that change of policy to the Islanders
directly. Although BWD occasionally forwarded team physicals after
this date, it was under no obligation to do so.
 Once BWD returned Lindros's 1993 team physical to the
Islanders, citing the rule change, the Islanders never requested
that BWD send it on to the underwriters. As the trial court
determined, BWD had no independent duty to confirm the veracity of
the statements contained in the Islanders's applications for the
insurance coverage and did not sign the forms; it merely fulfilled
the administrative task of checking to see if the questions asked
on the forms had all been answered.
 Affirmed.